## JACKSON v. SWIFT & CO., Limited, et al. (TOWNS, Intervener).*
### No. 4697.

Court of Appeal of Louisiana. Second Circuit.

Jan. 3, 1934.

Hawthorn, Stafford & Pitts and Isaac Wahlder, all of Alexandria, for appellants.

J. B. Nachman, of Alexandria, for appellee.

MILLS, Judge.

Plaintiff claims of defendant and its insurer compensation, and $150 for burial expenses, under Act No. 20 of 1914, as amended, for herself individually and for the benefit of her minor child, Williett Young, for the death of her alleged husband, John W. Jackson. Mary Helen Towns, a dependent daughter of Jackson, intervened, denying the claim of plaintiff and asserting her sole right to compensation.

Defendants answer, denying the claims of both plaintiff and intervener.

When on the trial of the case it developed that Williett Young was not the daughter of plaintiff, the demand as to her was abandoned. The right of intervener to compensation is not seriously contested.

After due trial had, in an able written opinion, the district judge rejected plaintiff's demands in toto and gave judgment for intervener as prayed for. From this judgment plaintiff has appealed.

Elijah Young and Amy Sewell, negroes, were lawfully married in the year 1898. In 1900, Amy sued Elijah for an absolute divorce, alleging adultery. The minutes of the court of date January 22, 1900, show this entry: "Case set for today and submitted on testimony in the record. Judgment rendered in favor of plaintiff of absolute divorce as prayed for. (See Decree)."

Appended to the copy of the minutes filed in the record is the certificate of the clerk dated May 5, 1933, as follows: "I further certify

that after a careful search of the minutes of court for a period of six months from the date of rendition of said judgment, I am unable to find where a judgment was read and signed, and I further certify that no judgment is contained in the record."

Both of the parties to this action considered themselves divorced, each promptly contracting a second marriage, that of Elijah being to Mary Shorter, plaintiff herein, on December 16, 1903.

As the validity of this divorce is one of the chief issues in the present case, we will consider it before passing on to other complications. The above divorce is attacked solely on the ground that, though judgment was rendered, none was ever read and signed in open court. Article 543 of the Code of Practice provides: "All judgments must be rendered, read and signed by the judge in open court. * * *"

■ While there is a strong presumption as to the regularity of judicial proceedings, especially after a long period of time; while the oral judgment rendered contains the statement "see decree," which might be construed that there was a decree; and while the certificate of the clerk as to the minutes of the court covers only a period of six months after the rendition of the judgment—we will not concern ourselves with this phase of the matter, as counsel for defendants admit in their brief that no judgment was ever read and signed. It is apparent, then, unless the failure to read and sign the judgment has been cured by acquiescense, or plaintiff's right to contest it is barred by estoppel, that her marriage to Elijah Young was illegal, being contracted while he was still married to Amy Sewell.

■ As the judgment rendered disposed of all the issues between the parties, it was final as distinguished from interlocutory, but was not final in the sense that it was definitive and executory. Stark, Receiver, v. Burke, Watt & Co., 9 La. Ann. 344.

■ To make it definitive and executory, something further is required; that is, the reading and signing in open court. Until this is done, the judgment is incomplete; its effect is suspended. The failure to read and sign the judgment does not void and nullify it up to the point of its progress. It is merely held in abeyance and can be read and signed and made executory at any time. Saloy v. Collins, 30 La. Ann. 63.

■ Or it may be made final and definitive by its voluntary execution by the parties.

Article 567 of the Code of Practice provides:

"The party against whom judgment has been rendered can not appeal:

"1. If such judgment have been confessed by him, or if he have acquiesced in the same, by executing it voluntarily."

Article 612, Code of Practice, reads: "The nullity of a judgment rendered against a party without his having been cited, or by an incompetent judge, even if all the formalities of the law have been observed, may be demanded at any time, unless the defendant were present in the parish, and yet suffered the judgment to be executed without opposing the same. The same rule shall govern, as regards a defendant not qualified to appear in a suit where judgment has been given against him, if he suffer the judgment to be executed against his property without opposing the same."

These articles are based upon reason, as a party could have no interest in appealing from or opposing a judgment that he had voluntarily executed. Such proceedings after the voluntary execution of a judgment of absolute divorce would be wholly moot. It was so held in the case of State v. King, 109 La. 161, 33 So. 121, 125, which is directly in point. In that case the relator, who had contracted a second marriage, was not permitted to contest the validity of his prior divorce, the cour. saying: "We refer to the fact of relator's having contracted a second marriage under the circumstances shown. He could only have done this under authority of the judgment of divorce granted to his wife. He should come into court with clean hands, and he cannot take a position in this case which would place him before us in the position of a bigamist."

Articles 567 and 612 of the Code of Practice, quoted above, are cited as authority in this case.

■ We therefore conclude that, the divorce judgment having been voluntarily executed and made definitive by the remarriage of both parties, the marriage of Mary Shorter and Elijah Young, contracted in 1903, was a legal and valid marriage.

■ If we should be wrong about this, it being established by the evidence that both Elijah and Mary were in good faith when they married and continued to live together in good faith for more than 25 years, they were putative husband and wife.

Article 117 of the Civil Code provides: "The marriage, which has seen declared null, produces nevertheless its civil effects as it relates to the parties and their children, if it has been contracted in good faith."

As to what civil effects are produced by such a marriage, we find in Smith v. Smith, 43 La. Ann. 1140, 10 So. 248, 250, the following:

"The words 'civil effects' are used without restriction, and necessarily embrace all civil effects given to marriage by the law; or, in the language of Marcade in commenting on

the identical article in the French Code, such a marriage, 'although actually null, has the same effects as if it were not null,—the ordinary effects of a valid marriage. * * * Every marriage, though invalid, if contracted in good faith, produces the effects of a valid marriage in the interval between the celebration and the judicial declaration of nullity. When once such declaration intervenes, the marriage produces no further effect; but, be it understood, the effects produced remain forever.' 1 Marcade, 525.

"The marriage of plaintiff was never declared null during the life of Alexander Smith. It existed as a putative marriage at the instance of his death, and the civil effects resulting therefrom were then complete and indestructible."

■ From the above it would follow that, when persons go through a marriage ceremony in good faith, which is essential to a putative marriage, that marriage produces its full civil effects until it is judicially declared null. It cannot be simply ignored by the parties.

Article 87 of the Civil Code reads: "The law considers marriage in no other view than as a civil contract."

■ Then one of the civil effects of a putative marriage is that the putative parties cannot legally contract another marriage until the putative marriage is annulled by judicial proceedings. Therefore, in so far as Mary's subsequent marriage with Jackson is affected, it makes no difference whether her marriage with Young was legal or putative.

As to the plea of estoppel against plaintiff, Mary, being ignorant of the defect in Elijah's divorce proceedings and being no party to them, is not estopped from contesting their validity in so far as her interests are concerned.

■ After their marriage Mary and Elijah lived together and accumulated considerable property as man and wife, until in February, 1928, she obtained a judgment of separation from bed and board. At that time there was a settlement of the community, she receiving as her portion deed to a lot and two houses, to which she still claims title. Afterwards, on November 8, 1932, she, without ever obtaining a judgment of absolute divorce from Elijah, contracted a marriage with deceased, John W. Jackson. She contends that she was led to believe by her attorney in the separation suit that he had secured for her a decree of absolute divorce. In this she is emphatically contradicted by the attorney, a respected member of the Rapides bar, who testifies that she not only knew in advance that only a separation could be had on the evidence obtainable, but that she was specifically told and warned by him just prior to her marriage to Jackson that it could not be legally contracted until she had secured an absolute divorce. We believe the testimony of counsel, not only because it is entitled to great weight, but also because it is in strict accord with the facts. The admission of the testimony of the attorney was strongly objected to on the ground that he was disclosing, over the objection of his client, privileged communications, contrary to the provisions of article 2283 of the Civil Code, which reads: "No attorney or counsellor at law shall give evidence of anything that has been confided to him by his client, without the consent of such client; but his being employed as a counsellor or attorney, does not disqualify him from being a witness in the cause in which he is employed."

Even if the testimony in so far as it is relevant comes within the terms of the above article, it was made admissible by the testimony of plaintiff herself that she had been misled by counsel as to the character of divorce that he had obtained for her. Manifestly, she could not charge him with this dereliction of duty and then silence him in defense of his conduct by the plea of privilege. By going into the matter herself she waived whatever privilege she might have had. R. C. L., vol. 28, p. 58.

■ Plaintiff, then, being in bad faith, was neither the legal nor putative wife of John W. Jackson, deceased, and is without right to recover under the Workmen's Compensation Act.

The only remaining question is whether or not she is entitled to judgment in this proceeding for the $150 which she paid for burial expenses. Section 8, subsection 5, of the Act (as amended by Act No. 242 of 1928) reads: "The employer shall in every case coming under this act, furnish reasonable medical, surgical and hospital services and medicines not to exceed $250.00 in value, unless the employee refuses to allow them to be furnished by the employer, and in every case of death, the employer shall pay or cause to be paid reasonable expenses of the burial of the employee, not to exceed $100.00 and the reasonable contingent expenses in connection therewith not to exceed $50.00."

■ While we find that plaintiff cannot recover compensation under the act, the case is one coming under it. Therefore, it is a case in which defendant is liable for burial expenses. Plaintiff having paid them, we see no reason why she should not recover the amount from defendant.

For the reasons above given, the judgment of the lower court is amended by allowing the plaintiff judgment for $150, and by ordering defendant to pay the costs of both courts.

As amended, the judgment is affirmed.